UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COMPLAINT

ROLAND R. HICKS,

          Plaintiff

                                            CASE NO. 3:06CN25(JBA)

v

MICHAEL P. HAMPTON,

MATHEW STOCKLI,

JOSEPH DONATUCCI,

ADNAN SAKLI,

VINCENT CHOU,

MAXIMILLAN KAUFMANN,

BERYL WOLK,

KEITH BUCK,

MPH, LLC,

MESA FINANCIAL GROUP OF COMPANIES,

MESA TRADING & FINANCE,

MESASIA,

PRIME DOMAIN,

IMF,

MESA FINANCE & DEVELOPMENT,

NEW HORIZON,

GLOBAL OCEAN, LLC

PRIME CAPITAL GROUP,

MESA VENTURE MARKETING FUNDS,

GLOBAL PROJECT & DEVELOPMENT,

MESA FINANCIAL PARTNERS,

BERYL'S WORLD,

SEVEN OAKS FINANCIAL,

                        Defendants

**PARTIES**

1.   Plaintiff Roland R. Hicks is a citizen of
Connecticut who presently resides at McDougall Walker,
1153 East Street South, Suffield, CT 06080, inmate
number 333893 R25.  At all times during the facts
related herein Hicks was an attorney licensed with
the Connecticut State Bar, with offices in Greenwich,
Connecticut;

2.   Defendant Michael P. Hampton is a citizen
of California whose address is 5134 Sultana Avenue,
Temple City, CA 91780.  He has business addresses in
Pennsylvania and Washington;

3.   Defendant Mathew Stockli is a citizen of New
York whose address is 2 Hughes Avenue, Rye, New York
10580;

4.   Defendant Joseph Donatucci is a citizen of
Pennsylvania;

5.   Defendant Adnan Sakli is a citizen of New
York whose address is 2 Hughes Avenue, Rye, New York
10580;

6.   Defendant Vincent Chou is a citizen of Arizona;

7.   Defendant Maximillan Kaufmann is a citizen
of Georgia;

8.   Defendant Beryl Wolk is a citizen of Penn-
sylvania whose address is The Pavillon, 261 Old York
Road, Suite 930, Jenkintown, PA 19046;

9.   Defendant Keith Buck is a citizen of Oregon
with an address at P.O. Box 871986, Vancouver, WA 98687.

10.   Defendant MPH, LLC is a corporate citizen
of Connecticut, maintaining offices outside of Conn-
ecticut since 2003, maintaining offices in California
and Pennsylvania;

11.   Defendant Mesa Financial Group of Companies
is a Delaware Company with offices at 5134 Sultana
Avenue, Temple City, CA 91780;

-2-

12. Defendant Mesa Trading & Finance is a Delaware Corporation with offices at 5134 Sultana Avenue, Temple City, CA 91780;

13. Defendant MesAsia is a company organized in the United Kingdom and Delware, maintaining offices in CAlifornia, London UK and Pennsylvania;

14. Defendant Prime Domain is a Nevada Corporation with an address of P.O. Box 871986, Vancouver, CA 98687;

15. Defendant IMF is a Delaware corporation with offices at The Pavillon, 261 Old York Road, Suite 930, Jenkintown, PA 19046;

16. Defendant Mesa Finance & Development is a Delaware corporation with an address of 2 Hughes Avenue, Rye, New York 10580;

17. Defendant New Horizon is a corporation formed in Hong Kong with offices in California, New York and Pennsylvania;

18. Defendant Global Ocean is a Delaware corporation with an address at 261 Old York Road, Suite 930, Jenkintown, PA 19046;

19. Defendant Prime Capital Group is a Nevada corporation with an address at P.O. Box 871986, Vancouver WA 98687;

20. Mesa Venture Marketing Funds is a Delaware company with offices at 261 Old York Road, Jenkintown PA 19046;

21. Mesa Financial Partners is a Delaware company with offices at 2 Hughes Avenue, Rye NY 10580;

22. Beryl's World is a Delaware company with offices at 261 Old York Road, Jenkintown, PA 19046;

23. Global Project & Development is a Delaware corporation with an address at 5134 Sultana Avenue, Temple City, CA 91780;

24. Seven Oaks Financial is a Delaware corporation with offices in Georgia.

## JURISDICTION

This complaint is brought under 28 USC §13-32 as Diversity of Citizenship exists between the Plaintiff and each Defendant and the amount in controversy exceeds Seventy-Five Thousand Dollars.

## FACTS

1. In March 1999 Defendants Michael P. Hampton and Mathew Stockli, clients of Plaintiff Roland Hicks in 1996-98, approached Hicks to outline their plans for the formation, funding and operation of a "project development firm";

2. Hampton and Stockli wished to engage Hicks and his staff to design their corporate structures, draft employment contracts; negotiate, review, draft and execute joint venture agreements; among a host of other issues, all to be expected with the start up of a large business. In general, Hicks was to provide a wide range of corporate legal, financial and planning services;

3. The defendants presented documents from banks, individual and corporate asset holders and proposals for major construction projects worldwide;

4. They stated that it would take approximately two to three years to accumulate assets and operating capital in order to launch the company(s) with initial funding of a minimum of Fifty Million Dollars;

5. The defendants entered into a retainer agreement with Hicks in April 1999. The contract called for Plaintiff to provide the services discussed at a rate of Two Hundred and Fifty Dollars per hour, with Hicks deferring payment for two years as funding was received. The retainer bound the soon to be formed and future joint ventures;

6.    Hicks immediately began to perform a host of services including designing Defendant companies MPH, LLC; Mesa Financial Group of Companies; Mesa Trading & Finance; Mesa Finance & Development; and Mesa Financial Partners (hereafter referred to as the "Mesa Companies").  In addition, Hicks reviewed proposed finance agreements and potential joint ventures; drafted and executed contracts; and successfully defended the nascient companies against a law suit filed by a joint venture party;

7.    Through mid 2001 Hampton and Stockli continued to provide comprehensive documentation detailing the accumulation of hard assets from a number of sources, all pledged to the Mesa Companies.  They developed and produced a business plan, prospectus and web site, listing an impressive array of business partners representing banks, financial firms and corporations, foreign and domestic;

8.    On or about July 2001 Hampton and Stockli entered into an agreement to lease office space and services from the Plaintiff;

9.    Hampton and Stockli now were now exhibiting a portfolio of bank communications from UBS, Fortis, Royal Bank of Scotland, Bank of China, Bank of Taiwan, Bank ONe, CitiBAnk, among others;

10.    Hicks intorduced Hampton and Stockli to many of his friends, clients, and business associates for additional aide and services;

11.    Hicks invested and/or loaned substantial funds to the defendants and the Mesa Companies from his personal and business accounts, while arranging the same from friends and clients;

12.    In late June 2002 Hampton and Stockli left on a two and one half month trip to the United Kingdom and Switzerland to "put the last pieces of the puzzle together".  They formed additional companies, Defendants

MesAsia and New Horizon (hereafter included in the
"Mesa Companies");

13.    In late July Hampton and Stockli announced
the successful completion of a "major transaction"
with CitiBank and Bank of China.  They sent documen-
tation to the Plaintiff and directed him to form a
limited partnership to manage incoming funds of "at
least" $50 million dollars;

14.    Hicks fromed Prometheus Partners bringing
on board several friends and clients, all well known
in the media and business community as partners to
manage the firm;

15.    Stockli and Hampton also introduced Defendant
Vincent Chou, a "private banker" and an expert in
international banking, particularly in Asia.  Chou was
appointed an officer/director/shareholder of the Mesa Companies.

16.    In October 2002 Hampton and Stockli returned from
Europe stating that the companies would be funded within a
few weeks, at most.  They executed a promissory note in favor
of Hicks for all past due fees, expenses, loans, investments
and interests, from all Hicks' sources;

17.    In November defendants retained a prominent New York
based international law firm to handle several of their
corporate matters, including the purchase a company introduced
to them by one of Hicks' clients.  The firm, after reviewing
defendants' paperwork also agreed to work while awaiting
funding;

18.    Having apparently received no funding by May 2003,
defendants stated that they had "solved the problem" with their
transactions and had appointed defendant Adnan Sakli as the
Chief Executive Officer and a director of the Mesa Companies.
In an affidavit to Hicks Sakli confirmed Hampton's contention
that Sakli was an expert in project financing and had been
the prime mover behind the construction of the new Hong Kong
airport in the 1980s.  Sakli provided a comprehensive list
of his holdings complete with ISIN numbers as they were "posted

on Euroclear and Bloomberg".  A search of the Moody's web site did indeed exist;

19.  Shortly thereafter, as plaintiff was involved in virtually around the clock activities working with the Sakli assets, Hampton and Stockli hired defendant Joseph Donatucci, an expert in international finance and banking, to join the Mesa companies as an officer/director and/or shareholder.  He was to work with additional Sakli and Mesa assets and negotiate and execute contracts with Chou's new client, the People's Republic of Laos.  They stated that the Mesa companies were working closely with Laos in developing, financing and executing financial and contstruction projects;

20.  Hampton and Donatucci subsequently formed a joint venture company with defendant Keith Buck, president of defendant Prime Domain.  Buck was introduced as an expert in banking platforms and all manner of electronic communications and banking services, a fact supported by Prime Domain's web site;

21.  This company, Prime Capital Group, along with Prime Domain contracted to provide banking platforms and communication systems to Laos as they re-opened to the West (Laos just then being recognized by the U.S. Senate);

22.  In February 2004 the Mesa companies issued an Irrevocable Pay Order in the amount of $5 million payable to Hicks over a period of one year beginning on March 17th;

23.  Again in February, Hampton introduced defendant Maximillan Kaufmann as a new director/officer/shareholder of the Mesa companies.  Kaufmann, the owner of defendant Seven Oaks Financial was "an expert in the use of credit facitlities" with contacts "throughout the international banking community".  He was to deal with Mesa's assets and had "arranged a series of credit faicilities" at a number of well known international banks;

24.   In July 2004 Hampton related that the Mesa companies had formed additional joint venture companies utilizing Buck's contacts. defendants Global Ocean and Global Project & Development, with banking and corporate partners already in place already in place in Canada and Europe;

25.   A "bank check" was issued to Hicks in August for payment in full of all indebtedness to date.   The check was returned in September with the notation "account closed";

26.   In November, at the urging of Donatucci and Buck, Hampton and the Mesa companies executed several agreements with defendant Beryl Wolk, identified quite colorfully on his company's (defendant Beryl's World) web site as a media and info-mercial king.   Together they established defendant companies IMF and Mesa Venture Marketing Funds.   Wolk, accepting a position as officer/director and/or shareholder with one or more of the Mesa companies while assigning $500 million in "media bonds" to the companies, the bonds were listed on Bloomberg and were complete with a valuation from a Pennsylvania accounting firm;

27.   In December through February 2005, Hampton, Chou, Buck and Donatucci maintained that the companies had begun to install the banking platforms and credit card facilities in Laos and were receiving compensation;

28.   In June Hampton, now with office space in Wolk's offices in Pennsylvania, stated that the companies had established banking platforms at UBS and Fortis, had deposited the media bonds and were about to receive a line of credit.   He and Buck also announced that the companies were completing a lucrative contract with the U.S. Department of Defense;

29.   The promises of the defendants continue to the present.

## CAUSE OF ACTION

<u>Claim I</u>

1-29.  Paragraphs 1 through 29 are hereby incorporated as paragraphs 1-29 of Claim I;

30.  The contract for lease of office space and services executed on or about July 2001 called for payments of $3,000/month;

31.  Defendants Hampton, Stockli and the Mesa companies enjoyed the use of the office and services through July 2003;

32.  Defendants have failed to pay any portion of the rents due to date;

33.  Defendants have breached their contractual duty, causing the Plaintiff harm.

<u>Claim II</u>

1-33.  Paragraphs 1 through 33 of Count I are hereby incorporated as paragraphs 1-33 of Claim II;

34.  Hicks and his staff expended enormous effort and time on the defendants' behalf from April 1999 through the summer of 2005;

35.  In late 2002 Hampton and Stockli showed overwhelming physical evidence that their companies were about to receive at least $50 million dollars of start up capital;

36.  In August Hicks had an opportunity to purchase a newly constructed house in Greenwich, Connecticut.  Hicks contacted Hampton and Stockli in Europe to relate that he had a rare opportunity and would not move ahead with an offer or enter into a contract unless he was assured of defendants' payment by the end of November;

37.  The defendants assured Hicks that he would "close with ease", providing corporate paperwork and banking information supporting the assertion;

38.   Hicks entered into an agreement to purchase the home, depositing a downpayment of $327,500;

39.   Hicks was scheduled for long overdue hip replacement surgery in late September.  Before entering the hospital Hicks contacted the defendants again and explained that (a) he would be out of the office and generally unavailable for any business reason for at least two weeks; (b) upon his return to the office he would not be able to devote his customary time to business affairs and could not be "running around" to complete "the transactions"; (c) he could nullify the house contract, with full return of his down payment any time in the next few weeks; (d) if the defendants therefore had any doubts whatever about the timing of payment, they should tell him now;

40.   The defendants stated catagorically that there "were no problems on any front in regard to Hicks' payment and funding Prometheus Partners;

41.   By November the defendants were stating that the funds "would be late, but only by a week or so".  With the approval and surety of the defendants Hicks hired a mortgage broker to provide and emergency bridge loan to purchase the house short term while awaiting payment.  The defendants supplied the broker's attorneys with documentation supporting the claim;

42.   Similtaneously, Hicks was forced to add additional funds to his down payment to forestall breach of the purchase contract.  He consulted with defendants before doing so, was shown documentation supporting payment and was guaranteed the the defendants would reimburse the this and any other additional outlays;

43.   In late November the defendants assured Hicks that they had a "backup plan" to pay Hicks immediately so that he would not lose the house.  In a conference call Hampton and Chou stated that they were issuing a Letter of Credit from the Bank of Taiwan to Hicks' account at Greenwich Bank & Trust.  They stated that Hicks would have "no problem pulling down on" the instrument and would have cash for closing;

44.   Initially enthusiastic about the Letter of Credit Greenwich Bank & Trust failed to return any of Hicks' phone calls throughout late December.  Hicks finally received information in August 2004 that the instrument was "probably a forgery".  When informed of this fact, Hampton replied that he "was not surprised";

45.   Through February 2003, Hicks continued to amass additioanl costs and expenses due to the inability to close. He came under increasing pressure from his friends, clients and business associates that had performed services or given funds to the defendants to remit the funds that were "due in any day".  All of this was known to defendants who kept providing documentation proving funds were on the way;

46.   Hicks lost the house and all his deposits on February 16, 2003, retaining an option to repurchase the house until sold.  That occurred on August 1, 2003;

47.   During this period the defendants continued to sent documentation, twice stating that a bank wire had been sent to his account and would be "available in hours";

48.   Hicks relied on Defendants' several of whom represented themselves as experts, statements and supporting documentation in continuing to provide services, investing funds from personal and business accounts as well as clients, and depositing funds the purchase the house;

49.   Defendants knew of Plaintiff's reliance at all times, in all areas;

50.   The defendants' statements, documentation and actions, given as fact were false;

51.   Defendants knew that their statements, documentation and actions were false and used them to induce Hicks and his staff to continue to work for them in all regards, as well as continuing to rent them office space, introduce them to investors and business partners, etc.  As such they fraudulently misrepresented themselves and their companies;

52.   Plaintiff Hicks suffered great catastrophic financial loss and the severe tarnishing of his personal and

professional reputations as a result of his reliance.

Claim III

1-52.   Paragraphs 1 through 52 are hereby incorporated as paragraphs 1-52 of Claim III;

53.   In the alternative, if not intentional misrepresentation, the facts put forth in Claim II constitute negligent misrepresentation by the defendants;

54.   As a result of his reliance on those negligent representations plaintiff suffered catastrophic financial loss and the severe tarnishing of his personal and professional reputations.

Claim IV

1-54.   Paragraphs 1 through 54 are hereby incorporated as paragraphs 1-54 of Claim IV;

55.   In June 2003 when Hicks met with Hampton, Stockli and the newly appointed Sakli, he was asked to continue working for the defendants as "the quicker you help us, the quicker you'll be paid".  This statement was accompanied by the Bloomberg and Euroclear printouts of Sakli's holdings;

56.   Hicks produced hundreds of pages of documents and met with high ranking officials at Merrill Lynch, Smith Barney, Morgan Stanley and PNC Bank, among others, to arrange brokerage accounts for the defendants individually as well as for their corporations, for the transfer of these assets;

57.   As Hicks worked into the fall of 2003, he continued to receive documents from the defendants from "authoritative" sources supporting defendants' statements that funds "were close";

58.   Similtaneously Hampton, Stockli, Donatucci and Buck, stating that the Laos transaction was also close and provided documents purportedly signed by Lao government officials, Letters of Credit and Bank Guarantees, even a list of Laos' worldwide banking accounts.

59.   On numerous occassions, in person and by mail and e-mail, Hicks informed the defendants of (a) the dramatically

changing circumstances of his personal life due to their
failure to pay; (b) the increasing pressure from everyone Hicks
had involved, in any regard, with the defendants to
compensate them.  Defendants were reminded that they had been
promising payment to them as well and, based on their words,
actions and documents, expectations were high;

60.  If anything, the defendants issued even more
documentation, made more detailed statements and increased their
frequancy;

61.  BY early 2004, Kaufmann added his voice to the
assurances, going as far as stating on at least four occassions
that his banker at PNC Bank in Pittsburg was calling Hicks'
banker at Webster to arrange transfer of funds;

62.  In June 2004 Hicks sent a demand for payment to the
defendants.  He was immediately contacted by Hampton and
Donatucci and was told to "be a good soldier" and that "people
who make waves don't get paid".  Donatucci also threatened the
Plaintiff and his family and ended by stating that as attorney
for the companies, he would see to it that if sued they would
delay the proceedings "forever", and if Hicks ever wished to
see payment he would help as much as he was asked;

63.  Hicks terminated the call and went to the Greenwich
Police Department where he was turned away;

64.  Hicks had no contact with the defendants until July
when he was contacted by Hampton and told that payment was on
the way.  Hampton, Buck and Donatucci caused a "bank check"
to be delivered to Hicks for deposit to his escrow accout;

65.  The check was issued from Dresdner Bank in Germany
and made payable to The Law Office of Roland Hicks in the amount
of $25 million (Euros).  It was expected that Hicks would take
the amounts owed him and his associates/clients and deposit
the remainder to accounts for the Mesa companies as operating
capital;

66.  Hicks deposited the check at Chase Manhattan with
a detailed memo concerning the check, the companies and

individuals involved and the use of funds.  He immediately informed several parties that reimbursement was in the works;

67.  When Hicks informed the defendants that the check had been returned "account closed" he was told that they would hire attorneys in Europe to get to "get to the bottom of it", while they spent their efforts negotiating the "final" aspects of the Laos transactions;

68.  BY November, when Wolk entered the scene, Hicks continued to provide services, curtailed as they may have been due to the circumstances created by the defendants, while being promised payment from multiple sources: Laos, a reissued check, pledging and transfer of Wolk's bonds, among others.  All, of course, relayed to the increasingly irate third parties of interest;

69.  From December 2004 through the summer of 2005, Wolk, Buck, Donatucci, Hampton and Chou continued to maintain that "payment was imminent", while informed of Hicks' rapidly disintegrating personal and professional lives.  Indeed, on several occassions officers of Wolk's companies called Hicks' debtors to reassure them of payment;

70.  In August 2005, the defendants informed Hicks that the Mesa companies had finally established a bank platform at UBS and Fortis banks and were about to receive a line of credit backed by the media bonds assigned by Wolk and his company;

71.  Hicks remains unpaid to date;

72.  The defendants made innumerable false statements knowing their representations were false, in order to induce the plaintiff to continue to work for them and to forestall legal action by the plaintiff and plaintiff's acquaintances;

73.  As a result of his reliance on those representations plaintiff suffered catastrophic financial loss and the severe tarnishing of his personal and professional reputations.

Claim V

   1-73.  Paragraphs 1 through 73 are hereby incorporated
as paragraphs 1-73 of Claim IV;

    74.  In the alternative, if not intentional mis-
representation, the facts put forth in Claim IV constitute
negligent misrepresentation by the defendants;

    75.  As a result of his reliance on those negligent
misrepresentations plaintiff suffered catastrophic
financial loss and the severe tarnishing of his personal
and professional reputations.

Claim VI

   1-75.  Paragraphs 1 through 75 are hereby incorporated
as paragraphs 1-75 of Claim V;

    76.  The Promissory Note executed in October 2002
and due in full on December 17, 2002, remains unpaid;

    77.  Defendants, as original signors of the Note,
and/or by their subsequant actions, are collectively become
endorsors and/or guarantors of the Note and are
individually and jointly liable;

    78.  Defendants Hampton, Stockli, Chou, Sakli,
Kaufmann, Buck, Donatucci and Wolk have acted beyond the
scope of their corporate duties, are not protected by
the corporate veil and are individually and jointly liable
for payment of the Note;

    79.  Defendants have breached their obligation to
the Plaintiff in failing to honor the instrument causing the
plaintiff great harm.

Claim VII

   1-79.  Paragraphs 1 through 79 are hereby incorporated
as paragraphs 1-79 of Claim VII;

    80.  The Irrevocable Pay Order executed on or about
February 2004 remains unpaid;

    81.  Defendants , as original signors of the note,
and/or by their actions, are endorsors and/or guarantors
of the instrument and are individually and jointly liable;

82. Defendants HAmpton, Stockli, Chou, Sakli, Kaufmann, Buck, Donatucci and Wolk have acted beyond the scope of their corporate duties, are not protected by the corporate veil and are individually and jointly liable for payment of the instrument;

83. Defendants have breached their obligation to the Plaintiff in failing to honor the instrument causing the plaintiff great harm.

Claim VIII

1-83. Paragraphs 1 through 83 are hereby incorporated as paragraphs 1-83 of Claim VIII;

84. Defendants entered into a retainer agreement with Hicks in April 1999. The agreement bound future companies and joint venture formed, organized or otherwise entered into in the development of their business plans. Hampton, Stockli, the Mesa Companies, Global Ocean, Prime Capital Group, Global Project & Development and Mea Venture Marketing Funds are all bound by the agreement;

85. Irregardless of the terms of the original agreement, all the defendants have, through word and deeds, acknowledged the agreement, enjoyed the fruits of the labors of the agreement and have continued to utilize Plaintiff's services and are thereby responsible for payment;

86. Defendants Hampton, Stockli, Chou, Sakli, Kaufmann, Buck, Donatucci and Wolk have acted beyond the scope of their corporate duties, are not protected by the corporate veil and are individually and jointly liable for payment;

87. Defendants breached their obligations causing the Plaintiff great harm.

-16-

Claim IX

1-87.  Paragraphs 1 through 87 are hereby incorporated as paragraphs 1-87 of Claim IX;

88.  The facts set forth in Claim VIII also constitute Theft of Legal Services;

Claim X

1-88.  Paragraphs 1 through 88 are hereby incorporated as paragraphs 1-88 of Claim X;

89.  The actions and representations of the defendants offend public policy, is immoral, unethical, oppressive and/or unscrupulous;

90.  The Plainitff and every party even peripherally associated or involved with the defenfants have suffered substantial injuries;

91.  The actions of the defendants violate Conn. Gen. Stat. §42-110b(a), the Connecticut Unfair Trade Practices Act (CUTPA).

Claim XI

1-91.  Paragraphs 1 through 91 are hereby incorporated as paragraphs 1-91 of Claim XI;

92.  The actions and activities previously related constitute violation of 18 U.S.C. §1961-1968, and constitute Civil RICO violations;

93.  Pursuant to the District of Connecticut's Standing Orders in Civil RICO cases and consistent with Fed.R.Civ.P. 11, Plaintiff will file a RICO case Statement within twenty days of the filing  of this complaint.

## REQUEST FOR RELIEF

THE PLAINTIFF, Roland R. Hicks, hereby demands:

### Claim I

1. Payment of back rents, @$72,000;
2. Interest;
3. Costs, attorney fees, expenses;
4. Any other relief the Court sees fit to impose.

### Claim II and III

1. Reimbursement of loss of the down payment and subsequant deposits, costs and expenses stemming from the loss of the house, an amount of approximately $650,000;
2. Return of all funds invested/loaned to the defendants, from the plaintiff and his friends/clients/business associates, an amount estimated at $850,000;
3. Damages in the amount of $5 million;
4. Interest;
5. Costs, attorney fees, expenses;
6. Any other relief the court sees fit to impose.

### Claim IV and V

1. Reimbursement of expenses, funds given, income lost, etc., in the amount of $1 million;
2. Damages in the amount f $5 million;
3. Interest;
4. Costs, attorney fees, expenses;
5. Any other relief the Court sees fit to impose.

### Claim VI

1. Payment of the principal amount of the Note, $3.6 million;
2. Interest at the highest amount allowed under Connecticut law for the period the note remained unpaid;
3. Costs, attorney fees, expenses;
4. Any other relief the Court sees fit to impose.

Claim VII
1.   Payment of the Irrevocable Pay Order in full,
$5 million;
2.   Interest at the highest rate allowed under Connecticut
law;
3.   Costs, attorney fees, expenses;
4.   Any other relief the Court sees fit to impose.

Claim VIII and IX
1.   Payment of all legal fees, approximately $1,700,00;
2.   Interest at the highest rate allowed under Connecticut
law;
3.   Costs, attorney fees, expenses;
4.   Any other relief the Court sees fit to impose.

Claim X
1.   Treble damages on the amounts awarded in Claim I-IX;
2.   Costs, attorney fees, expenses;
3.   Any other relief the Court sees fit to impose.

Claim XI
1.   Damages as the Court sees fit to impose;
2.   Costs, attorney fees, expenses;
3.   Any other relief the Court sees fit to impose.

## JURY DEMAND

PLAINTIFF, Roland R. Hicks, hereby requests
a trial by Jury in the above action.

Roland R. Hicks
333893 R25
MacDougall Walker
1153 East Street South
Suffield, CT 06080

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury
that he is the plaintiff in the above action, that he
has read the complaint and the information contained in
the complaint is true and correct.  28 U.S.C. §1746;
18 U.S.C. §1621.

Executed at Suffield Connecticut on JAN. 17, 2006 .

Roland R. Hicks, Plaintiff

-20-

## ORDER RE: DISCLOSURE STATEMENT

ANY NON-GOVERNMENTAL CORPORATE PARTY
TO AN ACTION IN THIS COURT SHALL FILE
A STATEMENT INDENTIFYING ALL ITS PARENT
CORPORATIONS AND LISTING ANY PUBLICLY
HELD COMPANY THAT OWNS 10% OR MORE OF
THE PARTY'S STOCK.  A PARTY SHALL FILE
THE STATEMENT WITH ITS INITIAL PLEADING
FILED IN THE COURT AND SHALL SUPPLEMENT
THE STATEMENT WITHIN A REASONABLE TIME
OF ANY CHANGE IN THE INFORMATION.
COUNSEL SHALL APPEND A CERTIFICATE OF
SERVICE TO THE STATEMENT IN COMPLIANCE
WITH D.CONN.L.CIV.R.5(c).

COUNSEL FOR THE PLAINTIFF OR REMOVING
DEFENDANT SHALL BE RESPONSIBLE FOR SERVING
A COPY OF THIS ORDER UPON ALL PARTIES
TO THE ACTION.

BY ORDER OF THE COURT

KEVIN F. ROWE, CLERK

(effective January 1, 2003)